# Supreme Court of Texas

## No. 20-0273

Cadence Bank, N.A.,

*Petitioner*,

v.

Roy J. Elizondo III and Roy J. Elizondo III, PLLC,

*Respondents*

On Petition for Review from the
Court of Appeals for the First District of Texas

**Argued October 26, 2021**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

In response to a stranger's email for legal assistance in settling a debt, respondent attorney deposited a large cashier's check in his bank account and then wired most of the funds to an overseas account. When the check was dishonored, the bank charged the transfer back to respondent, as allowed by the Uniform Commercial Code and the parties' deposit agreement. But respondent contends that the bank agreed to verify the funds before the wire transfer, precluding the chargeback. A divided court of appeals agreed. We disagree because the

wire-transfer form that respondent relies on did not create the contractual duty he claims. We reverse the judgment of the court of appeals.

## I

Roy Elizondo is a lawyer in Houston. He has an IOLTA deposit account at Cadence Bank that is governed by a deposit agreement.

In 2014, Elizondo was the victim of a scam. The scammer emailed Elizondo seeking his legal representation in a debt-collection action. As soon as Elizondo agreed to the representation, the scammer informed Elizondo that the debtor had agreed to settle and would mail Elizondo a cashier's check in the amount of the settlement. The scammer instructed Elizondo to deposit the check into his IOLTA account and then wire $398,980 to a third party in Japan. The scammer urged Elizondo to complete the wire transfer as soon as possible, claiming that the uncollected debt had impacted his cash flow and caused him to fall behind on bill payments.

A few days later, Elizondo received a cashier's check for $496,850 that appeared to be drawn from an account at Chase Bank. Elizondo deposited the check into his IOLTA account and was given a receipt stating, "All items are credited subject to payment".

The next day, Elizondo contacted Cadence to execute the wire transfer. Bank employee Shannon Yang-Oh emailed Elizondo a one-page form titled International Outgoing Wire Transfer Request. The form is attached as an appendix to this opinion. The top half of the form contains blanks for information about the sender and the recipient, their accounts, and the amount to be transferred. These blanks were filled in

2

by Yang-Oh with the information provided by Elizondo. The top part of the form also contains a printed declaration requiring the transferor to acknowledge that Cadence could not guarantee the delivery of an international wire, that the transferor could be responsible for "tracer fees" under certain circumstances, and that the transfer could take up to ten business days. Elizondo signed the form and emailed it back to Yang-Oh.

The bottom half of the form notes a transfer fee of $55 and contains fields for administrative information to be filled in by Cadence after receiving Elizondo's signature and before initiating the transfer. It also contains this preprinted admonishment to any Cadence employee who handles a wire transfer: "Before signing off, be sure you 'know your customer' and have verified the collected balance and documented any exception approvals."

Elizondo never saw the completed form until it was produced to him in discovery. One of the administrative fields in the bottom half of the form says "Collected Balance/Cash". The completed form shows "$497,643.89" handwritten in that box. Immediately to the right of that field, Yang-Oh signed her name under the prompt, "Employee Who Verified Collected Balance". Under those fields, there is a prompt for the signature of a bank officer, which was filled in by an assistant branch manager named Villatoro.

There are two versions of the completed form in the record. One reflects that before the transfer was initiated, the form also passed through the hands of another Cadence employee, S. Baker, who made some notes in the margins. The right-hand margin contains a hand-

written note signed by Baker reflecting that Elizondo's account had an "Ava Bal" (available balance) of $497,643.80. In the bottom margin, "verified @ 11:08 am" is handwritten.

Pursuant to Elizondo's instructions, Cadence wired $398,980 to the Japanese bank account Elizondo had identified on the form. The very next day, Chase dishonored the cashier's check and returned it to Cadence unpaid. Cadence notified Elizondo that the check was returned, charged the provisionally deposited amount back to this account, and demanded that he pay the overdrawn funds. Elizondo refused.

## II

Cadence sued Elizondo for breach of the deposit agreement, breach of warranty under Section 4.207 of the Uniform Commercial Code (UCC), and common-law torts. Elizondo raised various defenses and counter-claimed for breach of contract, fraud, and negligent misrepresentation. Cadence moved for summary judgment on its affirmative claims, and Elizondo filed a counter motion for summary judgment on his breach-of-contract claim. The trial court denied Cadence's motion, granted Elizondo's, and signed a final judgment that each party take nothing. A split panel of the court of appeals affirmed.[1] We granted Cadence's petition for review.

Elizondo does not dispute Cadence's allegations that by depositing a counterfeit check and then initiating a transfer of provisionally credited funds, he breached warranties established in

---

[1] 606 S.W.3d 802, 820 (Tex. App.—Houston [1st Dist.] 2020) (2-1).

4

Section 4.207(a) of the UCC.[2] Elizondo also does not dispute that both the UCC and the deposit agreement authorize Cadence to revoke credit provisionally given for the deposit of a check that is later dishonored. Section 4.214(a) of the UCC provides:

[2] Titled "Transfer Warranties", Section 4.207 states in part:

(a)    A customer or collecting bank that transfers an item and receives a settlement or other consideration warrants to the transferee and to any subsequent collecting bank that:

    (1)    the warrantor is a person entitled to enforce the item;

    (2)    all signatures on the item are authentic and authorized;

    (3)    the item has not been altered;

    (4)    the item is not subject to a defense or claim in recoupment (Section 3.305(a)) of any party that can be asserted against the warrantor;

    (5)    the warrantor has no knowledge of any insolvency proceeding commenced with respect to the maker or acceptor or, in the case of an unaccepted draft, the drawer; and

    (6)    with respect to a remotely-created item, the person on whose account the item is drawn authorized the issuance of the item in the amount for which the item is drawn.

TEX. BUS. & COM. CODE § 4.207(a). Cadence argues, and Elizondo does not dispute, that Elizondo breached the warranty in (a)(1) that he "is a person entitled to enforce" the check he deposited and the warranty in (a)(2) that "all signatures on [the check] are authentic and authorized". Section 4.207(d) states that these warranties "cannot be disclaimed with respect to checks." *Id.* § 4.207(d). Subsection (c) authorizes "[a] person to whom the warranties under Subsection (a) are made and who took the item in good faith [to] recover from the warrantor as damages for breach of warranty an amount equal to the loss suffered as a result of the breach". *Id.* § 4.207(c).

5

If a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor . . . or otherwise to receive settlement for the item that is or becomes final, *the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer . . . .*[3]

The deposit agreement also provides:

"We may deduct funds from your account if an item . . . is returned to us unpaid, or if it was improperly paid, even if you have already used the funds."

"Credit for any item we accept for deposit to your account, . . . is provisional and may be revoked if the item is not finally paid, for any reason, in cash or its equivalent."

"In the event a deposited item . . . drawn on any other payor is returned to us for any reason, . . . we may charge the item to your account . . . . We may debit all or part of a chargeback item to your account even if doing so results in or causes an overdraft to your account."

Absent Elizondo's counterclaims, this case might be open and shut. But the lower courts agreed with Elizondo that Cadence's damages were caused by its breach of a superseding contractual duty to transfer funds from a "verified" or "collected balance" that excludes provisionally credited funds. Elizondo's theory of contract formation is this: By signing the top part of the wire-transfer form and emailing it back to Yang-Oh, Elizondo made an offer to pay Cadence $55 to transfer money from the "collected balance" of his account, which, according to Elizondo, is the remaining balance once provisionally credited funds are excluded. That the transfer only be made from Elizondo's "collected balance" was a

---

[3] *Id.* § 4.214(a) (emphasis added).

6

material term of the agreement established by the administrative field with that phrasing in the bottom half of the form. Cadence accepted Elizondo's offer by completing the form and initiating the transfer. If Cadence had fulfilled its duty to ensure that Elizondo's "collected balance" was sufficient before making the transfer, then Cadence would have seen that Elizondo's collected balance was insufficient, it would not have made the transfer, and it would not have any damages.

The premise of Elizondo's contractual theory is that a banking customer's "verified" or "collected balance" is necessarily a balance that excludes provisionally credited funds. To support his motion for summary judgment, Elizondo offered expert-witness (deposition) testimony that a "collected balance" is an industry term meaning the bank client's "balance minus deposited checks in the process of collection."

Cadence argues that Elizondo's contractual theory is preempted by the UCC, which provides that the bank's statutory right to rely on the transfer warranties established in Section 4.207(a) cannot be disclaimed. Elizondo responds that the wire-transfer form does not disclaim any warranty but rather imposes a separate and distinct contractual obligation on the bank.[4] Cadence also denies that the wire-

---

[4] *Compare id.* § 1.103(b) ("*Unless displaced by the particular provisions of this title*, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." (emphasis added)), *and* U.C.C. § 1-103 cmt. 2 (AM. L. INST. & UNIF. LAW COMM'N 2021) ("[W]hile principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, or

transfer form created an enforceable contract imposing on it the duty that Elizondo claims, and it offered its own expert-witness testimony disputing Elizondo's narrow definition of "collected balance".

We need not resolve the parties' disagreement about whether the UCC allows a bank and its customer to make the contract that Elizondo claims. Whatever the answer, the wire-transfer form did not create any such agreement here.

## III

In *Compass Bank v. Calleja-Ahedo*, we examined whether a bank and its customer had altered a provision of the UCC in the customer's deposit agreement.[5] "The proper inquiry", we said, "is whether the statutory provision and the contractual provision contain conflicting rules governing the same circumstances."[6] We compared the language of the deposit agreement and the statutory provision and concluded that there was no conflict.[7] Importantly, we refused to stretch our reading of

---

the purposes and policies those provisions reflect, unless a specific provision of the . . . Code provides otherwise."), *and* TEX. BUS. & COM. CODE § 1.302(a) ("*Except as otherwise provided* in Subsection (b) or *elsewhere in this title*, the effect of provisions of this title may be varied by agreement." (emphasis added)), *and id.* § 4.207(d) ("The [transfer] warranties stated in Subsection (a) cannot be disclaimed with respect to checks."), *and id.* § 4.208(e) ("The [presentment] warranties stated in Subsections (a) and (d) cannot be disclaimed with respect to checks."), *with id.* § 4.103(a) ("The effect of the provisions of this chapter may be varied by agreement [with certain stated exceptions].").

[5] 569 S.W.3d 104 (Tex. 2018).

[6] *Id.* at 115.

[7] *See id.* ("The quoted contractual language does not express an intent to dispense with all the statutory limitations on liability that apply . . . .").

the deposit agreement beyond its plain language to find a conflict that was not clearly stated.[8]

The situation here is a step removed from *Calleja-Ahedo* because the parties dispute whether an enforceable contract even exists. So our analysis starts with these basic rules: "To be enforceable, a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'"[9] At a minimum, "a contract must at least be sufficiently definite to confirm that both parties actually intended to be contractually bound."[10] It must also be "sufficiently definite to 'enable a court to understand the parties' obligations'"[11] and "to give 'an appropriate remedy' if they are breached".[12]

Measured against these standards, the wire-transfer form fails to create the contractual duty that Elizondo urges. Its title is "International Outgoing Transfer *Request*". It has all the indicia of a form whose purpose is to facilitate Cadence's internal processing of the wire transfer. With one exception, all of the fields in the bottom half of the form were blank when Elizondo signed and returned it. The only

---

[8] *See id.* ("A contractual amendment to one set of protections does not automatically extinguish the other set of protections absent some indication the parties intended to do so."); *see also id.* at 114 ("Contracts, like statutes, should be construed based on their plain language.").

[9] *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Pace Corp. v. Jackson,* 284 S.W.2d 340, 345 (Tex. 1955)).

[10] *Id.* (citing *Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 846 (Tex. 2000)).

[11] *Id.* (quoting *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 846).

[12] *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 33(2) (AM. LAW INST. 1981)).

populated field was the one for the transfer fee, which contained "$55" in typeface.

The bases for Elizondo's claim are the two fields adjacent to the fee, "Collected Balance/Cash" and "Employee Who Verified Collected Balance". In Elizondo's view, the mere presence of these words on a form created by Cadence had the effect of implicitly imposing on Cadence a contractual duty that superseded its rights under the UCC and the deposit agreement. If that reasoning carried the day, then any one of a bank's routine administrative forms could potentially override the UCC's default rules.

We need not decide the meaning of "collected balance". Even if the record conclusively supported Elizondo's definition—which it does not— we would nonetheless hold that the transfer-request form was not "sufficiently definite to confirm that [Cadence] actually intended to be contractually bound" by a promise to only transfer "collected" funds.[13]

\*    \*    \*    \*    \*

We reverse the judgment of the court of appeals and remand this case to the trial court to consider any of Elizondo's remaining claims or defenses that are not based on breach of contract.

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** March 18, 2022

---

[13] *Id.* (citing *Fort Worth Indep. Sch. Dist.,* 22 S.W.3d at 846).

10

≡ CADENCE
BANK

INTERNATIONAL OUTGOING WIRE TRANSFER REQUEST

PLEASE TYPE ALL INFORMATION TO PREVENT MISREADINGS
AND INITIAL BESIDE ANY TYPED EMPLOYEE NAMES

| ACCOUNT NUMBER | CENTER NUMBER (4-DIGIT) | FEE CODE |
|---|---|---|
| 23320740 | 4076 | |

| SWIFT CODE | RECEIVER BANK NAME |
|---|---|
| AMASJPJZ | AMAGASAKI SHINYO KINKO BANK |

AMOUNT TO BE WIRED ($): $ 398,980.00

WRITTEN AMOUNT OF WIRE: THREE HUNDRED NINETY EIGHT THOUSAND, NINE HUNDRED EIGHTY and NO CENTS

I understand that the bank makes no guarantees concerning the delivery of international wires. I also understand that I will be responsible for tracer fees if a problem arises or if the funds are returned. I will accept the net proceeds. I have been made aware that this process may take up to 10 business days.

ORIGINATOR'S NAME: ROY J ELIZONDO III PLLC IOLTA

ORIGINATOR'S PHYSICAL ADDRESS: 5020 MONTROSE BLVD # 800, HOUSTON, TX 77006

PHONE NUMBER: 832-691-2383

BENEFICIARY'S NAME: NISHIKAWA BOUEKI NISHIKAWA NOBORU

BENEFICIARY'S ACCOUNT NUMBER: 4047214

BENEFICIARY'S PHYSICAL ADDRESS: 321 NUNOBIKI CHOU-KU KOBE CITY, HYOGO KEN JAPAN

PURPOSE OF WIRE: SETTLEMENT

| FEE | COLLECTED BALANCE TODAY | EMPLOYEE WHO VERIFIED COLLECTED BALANCE |
|---|---|---|
| $55.00 | $497,643.89 | Shannon Yang-Chan |

(margin notes:)
Ava.
Bal.
497,643.80
SBaker

Shanetta Baker  Shannon Yang  10:28am SBaker

REVISED 06/26/2014

verified @ 11:00am - SBaker

Modified 10:41

CB000103
905